## 5771.  GIBBS v. TIFTON COTTON MILLS.

1. There was no material variance between the allegations of the petition and the evidence introduced by the plaintiff.
2. Where, prior to the child-labor law of 1906, a child of tender years was injured while operating a machine, of which the defendant had put her in charge, whether the character of the machine was such that the dangers in operating it were patent to a child of her age and capacity, and whether she was guilty of negligence in the way in which she actually operated it, and thus brought her injury upon herself, are questions which should have been submitted to a jury, under proper instructions from the court.
3. The evidence in this case presents questions which should have been submitted to a jury, and it was error to grant a nonsuit.

DECIDED SEPTEMBER 19, 1914.

Action for damages; from city court of Tifton—Judge R. Eve. May 7, 1914.

*McDonald & Grantham, R. D. Smith,* for plaintiff.
*Fulwood & Skeen,* for defendant.

WADE, J. Ellen Gibbs, a minor, by her next friend, brought suit in the city court of Tifton to the October term, 1913, against

the Tifton Cotton Mills, alleging, that in the year 1904, when she was a small child, nine years old, she was working for the Tifton Cotton Mills at a spinning machine, and while so employed it was necessary for her to keep certain parts of the said machine, known as "travelers," properly oiled, and it was customary for her and the other employees operating such spinning machines to procure oil from the draft gear head, which was an iron frame covering the cogs on the steam-rollers that operated the spinning frame, and which, when in proper condition, covered all the cogs, and protected and prevented any one from being caught by them and injured; that in obtaining grease from the draft gear head to oil the travelers it was necessary to reach under the gear head, where the grease leaked or worked out therefrom, and get on her finger the small amount necessary to oil the travelers; that to operate the spinning frame properly, it was customary (as was generally known or could have been known by the defendant by the exercise of ordinary care and diligence) for its employees to secure from the said gear heads oil or grease for use on the "travelers;" that on account of the tender years of the plaintiff, she did not possess sufficient mental capacity "to appreciate the danger in coming in contact with the cogs above described and keeping her hand free from" them; that the operation of the machine was dangerous, and it was the duty of the defendant to warn her of such danger and to instruct her how to operate the machine, but the defendant failed so to warn or instruct her; that in the spring of the year 1904, after she had been working at the said machinery for 30 or 60 days only, and while engaged in operating it, in the performance of her duties she reached under the draft gear head, in order to obtain oil to grease or oil the "travelers," and, in so doing, her right forefinger was caught in the cogs, and mashed, ground, and mutilated up to and past the first joint, so that it was necessary to have the finger amputated, and it was amputated, just above the first joint; that the cogs which crushed her finger should have been covered with a proper cap or covering, and had they been so covered, as it was the duty of the defendant to have them covered, her finger would not have been injured as aforesaid; that on account of the cap being off from the bottom of the gear head, it was impossible for her to notice that it was off and the cogs thus exposed, and she did not notice that it was off and the cogs exposed; but,

on account of her tender years, even if the exposed cogs had been visible, she would not have had sufficient capacity to appreciate the danger incident thereto and to avoid the injury, and the defendant was negligent in putting her at work at the machine with the cogs thus exposed.

These allegations, together with others necessary as to the extent of the injury and the resulting consequences, made up, with some amplification, the plaintiff's petition. The evidence as a whole sustained the case as laid. At the close of the evidence introduced by the plaintiff, the defendant moved for a nonsuit, and this motion was sustained by the court. The plaintiff excepted.

As far as we can gather from the record and from the brief of counsel for the defendant, the principal grounds upon which the court granted the nonsuit were: that there was an apparent variance between the allegations and the proof; that the master was bound to nothing more than the exercise of ordinary care in furnishing machines equal in kind to those in general use, and reasonably safe for all persons who operate them with ordinary care and diligence; and that no duty is imposed by law upon the master to warn a servant in his employ, whether the servant be an adult or a minor of tender years, when placing the servant at work with machinery which is obviously not dangerous, or where no danger is incident to its ordinary use; and lastly that the servant can not recover unless both negligence on the part of the master and due care on the part of the servant be shown.

The evidence of W. H. Hobby (which is largely relied upon by the defendant to show a variance between the plaintiff's allegations and her proof) was as follows: "The cogs on the end of the draft gear head were usually covered up. They ought to have been covered up. They were covered with a kind of a little box,—that is they belong to be." Also: "On the end of the travelers frame there are some cogs necessary to operate. Those are very small cog wheels and are supposed to be entirely covered up, with a cast iron cap. I have seen those machines in operation with the cogs uncovered, when they would break occasionally. It is necessary to keep these cogs covered, as a great deal of lint and thread gathers about those frames, and it accumulates lint and dust, and it would get to where it would not operate at all. When it is covered, if the cap is on there, the only way a person could get his finger in there

would be to reach down under the cogs, or else turn the cover back. Those cogs just run together. If you want to put your finger in at the top, it would not catch it at all. You have got to stick it from underneath." And again: "There are those things that you call travelers, it is necessary and customary to oil those travelers. They always oiled them on this particular spinning frame when I worked there. They had an oiler for that purpose—those travelers—supposed to be an oiler for that purpose. I do not know why it was the duty of this child to oil that machinery. There was an oiler for that purpose. There is a tank in the building and used exclusively for that purpose. These children did not have to oil the travelers and did not do so unless they just wanted to. It was not their business to oil the cogs or nothing like that. Once in a while some of them would oil the travelers." "It is almost impossible, if these caps were on there properly, for any one to get his finger in there, unless you stick your finger under this way or let it back, to get your finger in the cogs. It is not necessary that the cogs underneath be covered up. All the cogs were covered up except on the underside. If it had been properly kept, all the cogs would have been covered up." It will be observed here that the witness Hobby testified that the cogs on the end of the draft gear head were usually covered up and ought to have been covered up; and while from his testimony it appears that to be injured, where the cap was over the top of the cogs, it would be necessary for a person to put his finger *underneath* the cogs, this evidence does not conflict with the allegations in the plaintiff's petition. The witness says, however, that it was customary and necessary to oil the travelers, but the Tifton Cotton Company had for that purpose an oiler, who always oiled them, and the children did not have to oil the travelers unless they wanted to, as it was not their business, but once in a while some of them would oil the travelers. The witness further testified: "It is not necessary that the cogs underneath be covered up. All the cogs are covered up except on the underside." But he testified also that "if it [the machinery] had been *properly kept, all the cogs would have been covered up*" (italics ours). This witness was working for the defendant at the time the injury occurred, and was the person who took the injured girl to the office and summoned a physician. He testified, it is true, that it would be difficult to be injured by these cogs if the cap was over them, and stated that

it was not necessary (perhaps meaning not necessary for the operation of the machine) that the cogs be covered underneath, but he added, as above, that if the machine had been properly kept, "all the cogs would have been covered up"—underneath, as well as on top; and his statement that it was not necessary to cover the cogs underneath, where his evidence showed that it was possible for one to put his finger in the cogs from underneath and thus be injured, amounted merely to an expression of his opinion. Besides, the fact that the plaintiff was actually injured by sticking her finger between the cogs from the underside would negative this mere conclusion of the witness.

The plaintiff herself testified, among other things, that there was a cap over the top of these cogs, but none under the bottom. "They told me it was broke. . . In order to grease those travelers I walked up and put my finger in there. . . I had been going in there all the time. The other folks that worked in there greased the travelers in that way. The travelers would get rough and would not run, and we would reach under the draft gear head where the oil worked out and get the grease to grease them." She said that she "never saw anybody that the company furnished to go round and oil the travelers," and that when she worked there she oiled them by reaching in under the draft gear head and getting the grease. "The top cap of that machine that stood over this gear was always there and was there when I got my finger cut. The way I got my finger in the machine at the time, I reached down underneath." The witness further said: "No one gave me any warning about the danger of those cogs. I did not know anything about the danger of those cogs. At the time I put my hand there, I did not know it was likely to be caught in there. When I was growing up I was a small child. I was a small child to my age. These cogs were not covered there beneath that gear head when I put my finger in there in order to reach those cogs. I just reached out. I did not have to stick my finger entirely underneath. You could not see a single one of the cogs standing at the machine with it covered up. In order to see them from the bottom you would have to get your head down under and look up." She further testified that when she first started to work at the spinning frame, some one put her to work and showed her how, but she did not know who the person was; that a man put her to work and this

man did not tell her anything but to run the "sides," and asserted that there was nothing about the machine that could catch her hand "except those cogs that were not covered up like they ought to have been."

The brother-in-law of the plaintiff (whose evidence the defendant relied on in part to show a variance) testified, that he had considerable experience with machinery of the kind that the plaintiff used when she was injured, and that "a spinning frame that operates by steam, that has four cylinders, shafts that are run by pulleys and has cogs which make each pulley or shaft run, and has cogs uncovered beneath, is a dangerous machine, if it is not properly kept and cared for; and machinery of that kind that has cogs that are not covered, is not properly cared for. One that has cogs underneath and has no cap over it, in my opinion is a dangerous machine." This witness testified that he obtained his experience with spinning machines at Fitzgerald, where they used a Whitley machine, and said that he did not know what machine was used at the defendant's mills. He also said much in reference to the safety of a certain spinning frame or machine, but from the context it appears that he had reference solely to the spinning machines used at Fitzgerald and with which he was familiar, for he said in regard thereto: "You have got to take the cap off to oil the top of the gears and the bottom. The draft gear head is covered *from the bottom, and this top fits over there."* He testified that he had operated such a frame when he was 19 or 20 years old, and had never been injured, and that he had seen many children operate like frames and had never known any one to get injured; that 48 machines were used at Fitzgerald, and most of them were operated by children, both before the child-labor law and since, and that he could not name an instance where one of them had been injured by "one of *these* spinning frames." The witness added: "I testified that it was a dangerous machine [evidently referring to the machine by which plaintiff was injured] and it is dangerous too. I have described the machines that I have operated. . . If one is properly protected it would be impossible for a child to get its finger in the cogs from beneath."

The plaintiff insisted that it was the duty of the defendant company to have a cap over the cogs on the steam rollers that operated the spinning frame, and that the cogs should have been covered

with a proper cap and covering. The proof showed that the cap was over the top of the cogs, and, in a narrow sense, therefore "covered" the same. The word "cover" may also include, and certainly, from the context and taking the entire petition together, was intended to include, more than the capping or covering of the upper side or part of the cogs and was used in the sense of completely inclosing or enveloping the cogs. The word "cover" is defined by the Standard Dictionary as meaning (among other things) "to overspread or overlay with something so as to protect or hide—enwrap;" and in Webster's New International Dictionary one meaning of the word given is "to envelop, to inclose."

The evidence disclosed that the cap over the upper part or top of the cogs (if they could be said to have a top) was intact, and was in place at the time of the injury, but it also shows conclusively that the cogs were not "covered" on the underside, and that there was no cap "over" the cogs entirely, but the cap was merely on their upper side. We see no material variance here between the allegations and the proof.

This cause of action arose before the adoption of the child-labor law of 1906, so that the employment itself of the child nine years old was not negligence per se on the defendant's part, but nevertheless the employer of a child of such tender years is held to a high degree of care in protecting the child from injury, and the child herself can not be held liable for contributory negligence, except for a failure on her part to exercise that degree of care and diligence which her mental and physical capacity fits her for exercising; nor can she be considered as having assumed a risk of even ordinarily patent, obvious, and known dangers, not within the scope of her capacity to appreciate and avoid. *Beck* v. *Standard Cotton Mills,* 1 *Ga. App.* 278 (57 S. E. 998).

From the allegations in the petition and from all the testimony it appears that the defendant placed the plaintiff, a child of nine years of age and without sufficient mental capacity to understand the dangers connected with the operation of spinning machinery, in charge of a spinning frame, and that the employment was a dangerous one, and that she was placed at this work without any warning or instructions as to the dangers naturally incident to the operation of such a machine; that the defendant was negligent in failing to furnish oil to oil the travelers, and in permitting the

plaintiff to get the necessary oil from the dangerous draft gear head, without warning or instructions as to the danger incident to thus procuring the oil. It is true that in the latter part of the petition it was alleged that the defendant was negligent in permitting the cap head to be broken off around said cogs, and in permitting it to remain dangerously exposed, but this appears to be one of several counts of negligence along this line, since in the same paragraph and elsewhere in the petition it is complained that the defendant was negligent "in not furnishing petitioner with machinery properly equipped for doing said work, and in not having said cogs, as hereinbefore alleged, securely protected by a cap head." The evidence did not sustain the count that the cap head had been broken, but clearly established that the machine was dangerous because there was no covering underneath the cogs, and that on account of this fact the plaintiff was injured. It might be considered that the evidence disclosed the danger as danger which would naturally result from the insertion of a finger underneath the cap and between the cogs exposed on the underside, and showed that such danger would be obvious to a person with only a small degree of intelligence, such as a child nine years of age should possess, but it is well settled that in the application of the doctrine of contributory negligence, in actions by children or in their behalf, for injuries occasioned to them by the negligence of others, their conduct should not be judged by the same rule that governs that of adults; and, while it is their duty to exercise ordinary care to avoid the injuries of which they complain, ordinary care in them is that degree of care which children of the same age, of ordinary care and prudence, would usually exercise under similar circumstances; and persons who employ children to work with or about dangerous machinery or in dangerous places must anticipate that they will exercise only such judgment, discretion, and care as may be usual among children of the same age under similar circumstances, and are bound to use due care, having regard to their age and experience, to protect them from the dangers incident to the situation in which they are placed; and as a reasonable precaution, in the exercise of such care in that behalf, it is the duty of such employers to instruct their youthful employees as to the dangers connected with their employment, which, from their youth and experience, they may not appreciate

or comprehend, that they may by the exercise of such care as ought reasonably to be expected of them, the better guard against and avoid injuries arising therefrom. See Cleveland Rolling Mill Co. v. Corrigan, 46 O. St. 283 (20 N. E. 466, 3 L. R. A. 385). In such cases, where there is no judicial presumption controlling the question as to whether the employer exercised the proper degree of care towards a minor employee, the question whether any special instructions should have been given in reference to machinery to be operated by the minor, depending upon the degree of care, safety or danger with which the machine could be operated by one too young to use discretion and judgment, is properly for solution by the jury.

As we understand the record, and without unnecessarily and to no purpose discussing well-settled principles, which appear to be recognized by able counsel on both sides of the case under consideration, we conclude that there was no such variance between the plaintiff's petition and the proof submitted in her behalf as would compel a nonsuit; we further conclude that under the allegations in the petition and under the proof as made in behalf of the plaintiff, she was entitled to recover, and hence the trial court erred in sustaining the motion for a nonsuit. As was said in *Duke* v. *Bibb Manufacturing Co.,* 120 *Ga.* 1074, 1076 (48 S. E. 408), "the plaintiff proved his case as laid, without establishing such additional facts as disproved his right to recover." In *Wynn* v. *Conklin,* 86 *Ga.* 40 (12 S. E. 183), the court said: "The testimony introduced by the plaintiff, which was weak, tended to support his declaration. . . We think the case made by the plaintiff was quite a weak one for the consideration of the jury. Yet we are not prepared to affirm the judgment of the court below awarding a nonsuit." Again, as was said in *McIntyre* v. *Empire Printing Co.,* 103 *Ga.* 288 (29 S. E. 923), "Whether the character of the machine was such that the dangers in operating it were patent to a child of plaintiff's age and capacity, and whether she was guilty of negligence in the way in which she operated it, and thus brought her injuries upon herself, are questions which should have been submitted to a jury, under proper instruction from the court." See also *Betts Co.* v. *Hancock,* 139 *Ga.* 198 (10), 208 (77 S. E. 77).

In this case there was evidence from Brown (who, according to his testimony, was an expert) that the machine at which the plain-

tiff worked, where the cogs were not entirely inclosed or covered, was a dangerous machine, and the evidence is undisputed that the defendant placed the plaintiff in charge of this dangerous machine, and, notwithstanding her tender years, and the probability of injury from the uncovered cogs, failed to instruct her that danger would be incurred by inserting her finger underneath the cogs to obtain oil to grease or oil the travelers, which the necessity of the work required should be greased or oiled. The testimony further showed that this plaintiff, as well as other employees of the defendant, made a regular practice of greasing the travelers with oil obtained from between these dangerous cogs; and while the witness Hobby testified that there was an oiler whose business it was to keep the travelers greased, and that no necessity existed for the children to grease the travelers, he did not deny the plaintiff's assertion as to her practice and the common practice of the other employees.    *Judgment reversed. Roan, J., absent.*